UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re | ) |
| | ) |
| ROBERT J. VEGA, | ) Case No. 6:10-bk-06873-KSJ |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| JAY C. CARY, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Adversary No. 6:10-ap-00298-KSJ |
| | ) |
| ROBERT J. VEGA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

From 1998 to 2008, Jay Cary, the *pro se* Plaintiff, provided monies to fund the construction business of his then friend, Robert Vega, the Debtor and Defendant. Cary now seeks to except these business "loans" from the Debtor's discharge[1] under Section 523(a)(2)(A) of the Bankruptcy Code[2] arguing the monies were obtained by fraud.[3] Because the Plaintiff has failed to prove Vega made any misrepresentations to Cary to obtain these monies and because the majority of the monies ($200,000) were transferred to the Debtor's company as an equity contribution, not a loan, the Court finds that the Plaintiff has failed to establish by a preponderance of the evidence that the debts due to him by the Defendant are not dischargeable.

---

[1] The Debtor received a Discharge on June 23, 2011. (Doc. No. 144 in his Main Case 6:10-bk-06873-KSJ.)
[2] References to the Bankruptcy Code refer to 11 U.S.C. § 101, *et seq*.
[3] The Court already has dismissed Cary's other claims to except the "loans" from Vega's discharge. *See* Order Denying Defendant's Motion to Strike and Partially Granting Defendant's Motion to Dismiss the Complaint, Doc. No. 113 (dismissing § 523(a)(4) claim); Order Granting Motion to Dismiss, Doc. No. 341 (dismissing § 523(a)(6) claim).

The primary purpose of bankruptcy law is to provide an honest debtor with a fresh start by relieving the burden of indebtedness.[4] Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor.[5] The party objecting to the debtor's discharge has the burden of establishing that the debtor is not entitled to receive a discharge by the preponderance of the evidence.[6] Accordingly, the Plaintiff bears the burden of proving by a preponderance of the evidence that any debt owed to him by the Defendant should be excepted from discharge.

Under Section 523(a)(2)(A) of the Bankruptcy Code, a debtor cannot discharge a debt to the extent the debt is obtained by "false pretenses, a false representation, or actual fraud." To prove fraud, the plaintiff must establish these elements: (i) the debtor made a false representation to deceive the creditor; (ii) the creditor relied on the misrepresentation; (iii) the reliance was justified; and (iv) the creditor sustained a loss as a result of the misrepresentation.[7] If the plaintiff fails to meet his burden of proof on any of the four elements, the bankruptcy court will not except the debt from the debtor's discharge under Section 523(a)(2)(A) of the Bankruptcy Code.[8]

In this adversary proceeding, Cary's transfers to the Debtor fall into three categories. First, from 1998 until 2007, Cary made irregular advances to help fund Vega's business of building luxury, "spec" houses (the "Home Loans"). Second, in April 2007, Vega wanted to broaden his construction business to build a very large and expensive condominium project called The Verandas in connection with this new venture, and, he borrowed $78,000 from Cary (the "$78,000 Loan"). Third, in May 2008, Cary transferred $200,000 to Winter Park Partners

---

[4] *Perez v. Campbell*, 402 U.S. 637 (1971); *In re Price*, 48 B.R. 211, 213 (Bankr. S.D. Fla. 1985); *Matter of Holwerda*, 29 B.R. 486, 489 (Bankr. M.D. Fla. 1983).
[5] *In re Cox*, 150 B.R. 807, 809 (Bankr. N.D. Fla. 1992) (citing *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir. 1986)); *Kiester v. Handy (In re Handy)* 164 B.R. 355 (Bankr. M.D. Fla. 1994).
[6] *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); *In re Chalik*, 748 F.2d 616 (11th Cir. 1984); *In re Metz*, 150 B.R. 821 (Bankr. M.D. Fla. 1993).
[7] *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998). *See also Field v. Mans,* 516 U.S. 59, 73-75, 116 S. Ct. 437, 445-46, 133 L. Ed. 2d 351 (1995) (holding that Section 523(a)(2)(A) requires justifiable rather than reasonable reliance).
[8] *In re Parker*, 377 B.R. 371, 377 (Bankr. M.D. Fla. 2006).

Development, LLC ("WPPD"), the entity created by Vega to complete construction of The Verandas. Cary contends each of these three types of loans are not dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.

## Home Loans

Vega was a builder who built large, luxurious "spec" homes in the Central Florida area. In 1995, Cary, a former commercial airline pilot, hired Vega to build a luxury home for him.[9] After Cary's home was completed, the two remained friends and business associates.

Around 1998, Vega approached Cary for a loan to help him build a spec home. Cary wrote Vega a check for $15,000. In the following years, Cary extended other loans in different amounts to Vega. Each loan was intended to provide financing to allow Vega to complete spec homes under construction. For example, in March 2002, Cary loaned Vega $50,000 to help cover up-front costs for a spec home Vega was building for Dr. Curtis Weaver.[10] Neither party introduced any credible proof relating to the details of these loans, such as promissory notes, repayment terms, interest rates, or a schedule of the total amount lent by Cary to Vega.[11]

---

[9] Def's. Ex. 57.

[10] Cary also lent Vega approximately $45,000 to complete a feasibility study on a residential subdivision Vega was considering on Dean Road. After concluding he could not obtain all of the real property needed for the subdivision, Vega abandoned the project. Although this $45,000 loan was not to build a single spec home, the use was similar and is included in the Home Loans category. The legal analysis is the same. Cary failed to prove that Vega made any type of misrepresentation in convincing Cary to make this loan.

[11] The Court notes that the Plaintiff's presentation at trial, held on October 7, 2013, admittedly was limited due to Cary's own failure to timely exchange exhibits and witness lists with the Defendant. (Doc. Nos. 261 and 294.) Although *pro se* litigants' pleadings are generally held to less stringent standards than those of attorneys, they still must comply with procedural rules and court orders. *Maus v. Ennis*, 513 F. App'x 872, 878 (11th Cir. 2013); *Moton v. Cowart*, 631 F.3d 1337, 1340 n.2 (11th Cir. 2011). The Eleventh Circuit Court of Appeals has held "that *pro se* litigants are subject to the Federal Rules of Civil Procedure, including sanctions for misconduct and for failure to comply with court orders." *Id*. (citing *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989)). "Trial judges and opposing litigants have a right to expect that the court's orders will be carefully followed in order that the business of the court may be handled expeditiously and fairly." *Woods v. Burlington N.R. Co.*, 768 F.2d 1287, 1290 (11th Cir. 1985) *rev'd on other grounds*, 480 U.S. 1, 107 S. Ct. 967, 94 L. Ed. 2d 1 (1987).

Here, Cary totally failed to timely provide the Defendant with his proposed trial exhibits or witness list, as directed by the Court, and offered no credible justification. I therefore precluded him from surprising the Defendant and the Court with exhibits and witnesses not timely disclosed prior to trial. (Doc. No. 294.) Cary, however, was allowed to testify and to cross-exam the Defendant's witnesses. The Court also reviewed Vega's testimony given at his deposition held on July 31, 2013 (Doc. Nos. 298-99); his meeting of creditors held on May 25, 2010 (Doc. No. 69 in Main Case No. 6:10-bk-06973-KSJ); and his examination taken pursuant to Bankruptcy Rule 2004 on July 27, 2010 (Doc. No. 69 in Main Case No. 6:10-bk-06973-KSJ).

Vega honestly intended to repay these loans and made a number of payments throughout the years. Between February 2000 and April 2003, Vega paid Cary at least $38,400 towards the Home Loans.[12]

Given the scarcity of evidence on the Home Loans, the Court cannot determine the total amount lent, the total amount repaid by Vega, or the outstanding balance. The evidence does demonstrate, however, that Vega made absolutely no misrepresentation to Cary to induce him to extend any of the Home Loans. Vega borrowed monies he intended to repay, and, in fact, he made substantial repayments on the loans. Cary never formalized any loan and never obtained any collateral to secure the repayment of the loans. Statements of intent to perform certain acts in the future "will not generally form the basis of a false misrepresentation that is actionable under Section 523(a)(2)(A) unless the creditor can establish that the debtor lacked the subjective intent to perform the act at the time the statement was made."[13] Plaintiff has failed to establish any basis to except the Home Loans from discharge under Section 523(a)(2)(A) of the Bankruptcy Code.

### The $78,000 Loan

Vega next wanted more of a challenge than simply building large single family homes. He explored developing a subdivision and an assisted living facility before deciding to take on a lavish condominium project in downtown Winter Park, named The Verandas. Units were advertised for sale at prices ranging from $1.8 million to $2 million.[14] To obtain financing for the project, Vega created Winter Park Partners Development, LLC ("WPPD") and received a loan from First National Bank of Central Florida (the "Bank"), totaling around $4.5 million.

Cary's involvement with The Verandas project began in a familiar fashion. In April 2007, Vega asked him for a short-term loan of $78,000, telling Cary he would lose the property

---

[12] Def's. Ex. 32.
[13] *In re Bucciarelli*, 429 B.R. 372, 375 (Bankr. N.D.Ga. 2010) (citing *In re Allison*, 960 F.2d 481 (5th Cir. 1992)).
[14] A photograph of the final project, as completed by a different developer, is shown in Defendant's Exhibit 45.

if Cary did not give him the monies. Cary optimistically hoped this project finally would result in sufficient profits that would allow Vega to repay all of the earlier loans. Cary lent Vega the requested $78,000. In return, Vega gave Cary a postdated check for $78,000, telling Cary he could cash it in a few months. Cary never cashed the check, likely because Vega never had sufficient funds in his bank account.

Similar to the Home Loans, Cary made this additional $78,000 Loan to Vega with full knowledge that Vega had not repaid him on the earlier loans and without collateral. Cary understandably hoped that providing this additional funding to Vega would allow him to generate sufficient profits from The Verandas project to pay him in full. Again, neither party provided any details on the terms of this loan.

Cary kept pressing Vega for repayment of the $78,000, insisting he needed to money to make repairs to his house, including installing a new air-conditioning unit. Vega did not repay the $78,000 in full, but, in April 2008, Vega paid to install a new $28,700 air-conditioning system in Cary's residence.[15] Cary never credited Vega for installation of the air-conditioning unit, claiming it was some sort of penalty for failing to pay back all the previous Home Loans. This Court finds the $28,700 cost of the air-conditioning system was partial payment of the $78,000 Loan.

Cary offered no misrepresentation made by Vega to Cary that induced him to make the $78,000 Loan. Vega, just like Cary, also hoped The Verandas project would succeed and, therefore, he gave Cary the post-dated check to repay the loan. He also paid to have a very expensive new air-conditioning unit installed in Cary's home. The fact that The Verandas project failed, as explained below, does not make the $78,000 Loan nondischargeable. Plaintiff has failed to establish any element under Section 523(a)(2)(A) of the Bankruptcy Code as to the $78,000 Loan.

---

[15] Def's. Ex. 33.

**$200,00 Equity Contribution to WPPD**

On May 8, 2008, Vega again approached Cary and asked him for an additional $200,000. Cary again agreed to supply the funding with full knowledge that Vega had not fully repaid the outstanding prior loans. In order to gather the funds, Cary took out a home equity line of credit on his house. Cary then wrote a $200,000 check payable to "Winter Park Partners Development, LLC."[16] Neither party provided any contract or documentation evidencing the terms of this transaction, just as they had failed to document any of the earlier loans.

Vega hoped The Verandas project would finish in approximately one year. Vega agreed that his company that built the spec homes, RJV Homes, Inc. ("RJV"), would pay the the first year of payments on Cary's home equity line of credit. RJV provided two checks to Cary: one for $10,000 and another for $15,000. Cary deposited the $10,000 check but was unable to deposit the $15,000 check. Cary's $200,000 check to WPPD states "$25,000 back RJV" in the memo line, indicating these checks were written from RJV Homes.[17]

Cary's testimony on the purpose of the $200,000 transfer is inconsistent, at best. At times, Cary claimed the monies were a loan to Vega personally. At other times, Cary claims he understood he contributed the $200,000 as an equity investment or a loan to WPPD believing the project had only two investors: he and Vega.

The Court concludes that Cary made the $200,000 transfer as an equity investment in WPPD and not as a personal loan to Vega or a corporate loan to WPPD. Cary repeatedly refers to himself as an "investor" in his complaint.[18] Cary listed WPPD as the payee on the check, not Vega.[19] WPPD's Amended Operating Agreement listed Cary as a 6% equity holder, as did WPPD's 2009 tax return.[20] Emails Cary sent to WPPD's counsel indicate he considered himself

---

[16] Def's. Ex. 13.
[17] *Id.*
[18] Amended Compl., Doc. No. 11 at ¶ 109-25.
[19] Def's. Ex. 13.
[20] Def's. Exs. 18-19.

a member of the LLC. Indeed, he attempted to use his membership status to obtain a copy of WPPD's settlement agreement with the architect.[21] In the same email, Cary states he "loaned $200,000 to WPPD," which shows that, even if Cary intended the advance to be a loan as opposed to an equity contribution, he meant it as a loan to WPPD, not Vega individually.[22]

Moreover, Cary duplicity signed documents, including a check for $90,000, to convince the Bank that WPPD was selling condos, when, in reality, it was not. In July 2007, Cary undisputedly signed a Unit Reservation Agreement allegedly to purchase one of The Verandas units for $2,025,000. He gave Vega a $25,000 check for a supposed escrow deposit.[23] Cary could never had afforded to buy this unit and never had any honest intent to purchase it. Neither Cary nor Vega expected WPPD to cash this "escrow" check. Rather, the Unit Reservation Agreement was created just to show the Bank that WPPD had a potential sale.

Cary testified he thought this agreement was to provide him some sort of "collateral" guaranteeing repayment of the outstanding loans. This testimony was not credible. The agreement clearly states its purpose: to serve as an offer to buy a condominium, if and when the condominium was available for sale.[24] The Court specifically finds that Cary signed the Unit Reservation Agreement to assist Vega in obtaining or maintaining financing provided by the Bank and with no intent to purchase a condominium.

When the Bank again wanted more proof of future sales, Vega complied, again relying on Cary's assistance. On May 19, 2008, just 11 days after making the $200,000 transfer to WPPD and consistent with the Unit Reservation Agreement, Cary purportedly signed a Purchase and Sale Agreement.[25] Vega says Cary signed it; Cary disagrees. The Court makes no specific finding as to whether the Cary actually signed the Purchase and Sale Agreement, as it is not

---

[21] March 25, 2010 Email from Jay Cary to Peter Carr, Def's. Ex. 25.
[22] *Id.*
[23] Unit Reservation Agreement, Def's. Ex. 1.
[24] *See id.*
[25] Def's. Ex. 3.

germane to Cary's claim, but surmises it was used by Vega to either obtain or maintain financing for the Verandas project with the Bank. The Court does note, however, that Cary personally confirmed his "intent" to buy the unit in a later call with an officer of the Bank, Mr. William Dills, in February 2009.[26]

Cary further undisputedly knew of the Purchase and Sale Agreement because he affirmatively worked with Vega to again mislead the Bank. Cary personally supplied a check for $90,000 to Miller, South, Milhausen, PA ("Miller South"), the Bank's designated escrow agent for The Verandas project.[27] This check, dated August 31, 2008, acted as Cary's "deposit" on the unit he was to purchase, as required by the disputed Purchase and Sale Agreement.[28] But, in reality, the fake "deposit" monies were supplied to Cary by another insider, Scott Brown, a 64% owner/member in WPPD. The deposit was a subterfuge made to convince the Bank that they had a buyer for at least that one unit in order to maintain financing.[29]

Around this time in 2008 and 2009, when the Bank was demanding proof of sales and the overall real estate market was collapsing, The Verandas encountered construction problems stemming from a possible error by their architect, as discussed in a July 2008 meeting.[30] WPPD stopped construction. Litigation involving the architect was filed and eventually settled in February 2010.[31]

Vega credibly testified the faulty architectural plans were the primary reason for the project's failure. The collapse of the real estate market at the same time did not help. The Court

---

[26] Def's. Ex. 7.
[27] Def's. Ex. 4.
[28] Def's. Ex. 3.
[29] Ironically, in August 2009, Cary directed Miller South, the Bank's escrow agent, to return the $90,000 to him. Remember, this is the $90,000 initially given to Cary by Scott Brown to mislead the Bank. Cary never had any equitable interest in the $90,000. This caused Miller South to file an interpleader action to determine who was entitled to the money—the Bank or Cary. Over two years later, the state court entered a default judgment against Cary in the interpleader action and directed Miller South to pay the money to the Bank in December 2011. Notably, the state court found "the undisputed record reflects that Cary and [Winter Park Partners Development, LLC] entered into a Contract for the construction and sale of a residential condominium unit." (Def's. Ex. 12, at 4.)
[30] Def's. Ex. 47.
[31] Def's. Ex. 49.

specifically finds that Vega sincerely wanted The Verandas project to succeed. He worked hard on the project and has lost all of his businesses as a result of the project's failure.

In June 2009, Scott Brown, the 64% owner of WPPD, assumed control of the project. Cary formally rescinded his hollow "offer" to purchase the condominium at The Verandas.[32] Eventually, Vega relinquished his entire ownership interest in WPPD to Brown.[33] On April 23, 2010, Vega filed this Chapter 7 bankruptcy case.

Cary at trial contended that his $200,000 transfer to WPPD was a personal "loan" to Vega. The Court finds that the $200,000 advance was, in actuality, an equity contribution into WPPD. But, even if the advance were treated as a *loan* to WPPD, Cary still has failed to establish any personal liability by Vega to him in connection with the $200,000 transfer.

When determining whether an advance should be treated as debt or equity, courts look to the actual manner, not the form, in which the parties intended to structure a specific advance.[34] "[A] court is not required to accept a party's characterization of an advance as a loan, but may recast the advance as a contribution to capital."[35] The Eleventh Circuit has identified numerous factors to consider when classifying an advance as a loan or equity contribution.[36]

Intent of the parties is one factor.[37] Although Cary insisted at trial that the $200,000 was a loan to Vega, other circumstances indicate he intended the advance to be an equity contribution to WPPD. During his narrative testimony, he stated that at the time of the advance, he believed he and Cary were "the only partners in the project." Additionally, Cary's complaint repeatedly refers to himself as an "investor."[38] He also attempted to attract other investors and used his membership status to obtain settlement documents between WPPD and its architect. Vega's

---

[32] Def's. Ex. 8.
[33] Def's. Ex. 18.
[34] *In re Hillsborough Holding Corp.*, 176 B.R. 223, 248 (M.D. Fla. 1994) (citing *In re Lane*, 742 F.2d 1311, 1315 (11th Cir. 1984)).
[35] *Id.* (citing *Matter of Herby's Foods, Inc.*, 2 F.3d 128 (5th Cir. 1993)).
[36] *In re Lane*, 742 F.2d 1311, 1314-15 (11th Cir. 1984).
[37] *Id.*
[38] Amended Compl., Doc. No. 11 at ¶ 109-25.

testimony and actions were consistent—Cary's $200,000 bought him a 6% equity interest in WPPD.

In determining the parties' intent, "[a] court must look not simply at self-serving declarations of the parties, but instead must examine those circumstances surrounding the transaction."[39] Here, no interest rate was associated with the $200,000 advance. One of the more notable differences between loans and equity investments is "the contractual interest rate on loans versus the unknown risk premium of equity investments."[40] "A true lender is concerned with interest."[41] "When a corporation contributor seeks no interest, it becomes abundantly clear that the compensation he seeks is that of an equity interest."[42]

Cary never alleged the advance carried any interest rate, and the evidence certainly does not support a finding of any applicable interest rate. Cary was granted a 6% ownership interest in WPPD in return for the advance.[43] In his complaint, Cary admitted receipt of ownership interest was part of the transaction.[44] Further, the $200,000 check was written to WPPD, not Vega individually.[45] Because an interest rate is so closely associated with the very nature of a loan, the complete absence of one, combined with other objective facts, persuades the Court that the parties intended the advance to be an equity transaction.

Another factor considered is what the party who made the advance received in the transaction: a promissory note or stock.[46] "The lack of a promissory note, in conjunction with lack of other formalities, may indicate that advances are equity contributions."[47] As far as the record shows, Cary received nothing tangible in return for the $200,000 check, much less a promissory note or stock certificate. Virtually no formalities were observed with the

---

[39] *Lane*, 742 F.2d at 1316.
[40] *In re Pearlman*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010), *aff'd*, 478 B.R. 448 (M.D. Fla. 2012).
[41] *Lane*, 742 F.2d at 1316 (quoting *Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968)).
[42] *Id.* (quoting *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 582 (5th Cir. 1977)).
[43] Amended Operating Agreement, Def's. Ex. 18.
[44] Amended Compl., Doc. No. 11 at ¶ 110.
[45] Def's. Ex. 13.
[46] *See Hillsborough Holding Corp.*, 176 B.R. at 248 (citing *Lane*).
[47] *Id.* (citing *Estate of Mixon v. United States*, 464 F.2d 394, 464 (5th Cir. 1972)).

transaction—it was not evidenced by any writing whatsoever other than the check itself. This weighs in favor of treating the advance as an equity contribution.

Because virtually no formality was observed, the source of the intended repayment is unclear, which is another relevant factor.[48] Although Cary hoped to be repaid whether WPPD proved successful or not, he understood the actual *source* of repayment was to come from profits arising from the sale of the condominiums.[49] This suggests repayment was tied to the financial success of WPPD—the successful sale of The Verandas condominiums. Unfortunately, the project failed. This factor suggests the advance was an equity contribution.

The absence of a fixed maturity date or repayment schedule also weighs in favor of equity treatment. "The absence of a fixed repayment schedule may suggest that the repayment is tied to the financial success of the business and therefore point to an equity transaction."[50] The evidence does not show the Parties agreed to any fixed maturity date or repayment schedule for the advance. Cary claims he was to be repaid in a year, but no evidence corroborates this understanding. Vega did give checks of $10,000 and $15,000 to Cary to help him cover interest payments on his home equity line of credit for one year, but this alone does not prove the loan had a fixed maturity date.

In light of all of the factors discussed above, the Court concludes the $200,000 advance was an equity contribution to WPPD. The circumstances surrounding the advance, especially the lack of any interest rate, indicate the parties intended the advance to be an equity contribution. Other factors, such as complete lack of formality, promissory note, or repayment schedule also support this conclusion.

Even if the Court decided the advance was indeed a loan, Cary made the loan to WPPD—a corporate entity distinct from Vega individually. Cary's own words evidence this

---

[48] *Id.* at 249.
[49] Amended Compl., Doc. No. 11 at ¶ 85 ("Cary would then be able to collect his money and investment from the sale [of the condominium] according to Vega.).
[50] *Hillsborough Holding Corp.*, 176 B.R. at 249 (citing *Mixon*).

conclusion. In a March 2010 email, he stated: "I did loan WPPD $200,000 that was to be paid back by May 31, 2009."[51] This admission shows that if he intended the advance to be a loan, it was made to WPPD, not Vega.

Even if the Court assumes Vega somehow was personally liable for the $200,000 advance, a conclusion not supported by the evidence, Cary still has failed to prove, by a preponderance of the evidence, any of the elements required by Section 523(a)(2)(A) of the Bankruptcy Code to make the debt nondischargeable. Cary did not prove that Vega made any affirmative misrepresentations to deceive Cary into advancing the $200,000.[52] More importantly, Cary did not prove that he actually or justifiably relied on any misrepresentation when making the advance.[53] Cary simply did not meet his burden to prove that the debt is nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code, even if Vega somehow were personally liable for the $200,000 advance.

Cary has lent a lot of money to Vega personally. He also heavily invested in Vega's company, WPPD. Vega repaid some of these monies, but Cary will lose substantial funds.

Sadly, Cary encumbered his home by a $200,000 mortgage to gather the funds. Cary will suffer substantially from Vega's discharge. The loss, however, is not attributable to Vega's fraud. Cary failed to take any act to protect his investments. He never got a security interest or even a promissory note. He continued to lend money to Vega when he remained unpaid on earlier loans. Although the Court is very sympathetic to Cary's loss and is very cognizant of the leniency afforded to *pro se* parties, the Court concludes that the Plaintiff has failed to prove any of the required elements of Section 523(a)(2)(A) that would make any debt due by Vega to Cary nondischargeable.

---

[51] Def's. Ex. 25.
[52] *See In re Quinn*, 492 B.R. 341, 346 (Bankr. N.D. Ga. 2013).
[53] *Field v. Mans*, 516 U.S. 59, 76, 116 S. Ct. 437, 446, 133 L. Ed. 2d 351 (1995) ("As for the reasonableness of reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact.").

A separate and final judgment in favor of the Debtor/Defendant and against the Plaintiff consistent with these Findings of Fact and Conclusions of Law shall be entered.

DONE AND ORDERED in Orlando, Florida, on November 26, 2013.

                                              KAREN S. JENNEMANN
                                              Chief United States Bankruptcy Judge